United States Court of Appeals,

Fifth Circuit.

No. 93-1577.

Zella HININGER, Individually and as Personal Representative of the Estate of Thurlo Hininger, a/k/a Ted Hininger, Plaintiff-Appellee/Cross-Appellant,

v.

CASE CORPORATION, et al., Defendants,

Can-Am Industries, Inc., Defendant-Appellant/Cross-Appellee.

June 22, 1994.

Appeals from the United States District Court for the Northern District of Texas.

Before GOLDBERG, DAVIS, and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

In this products liability action, plaintiff seeks to recover her lost profits and repair costs resulting from the failure of combine wheels manufactured by defendant and supplied to Case for incorporation into the combines. The district court awarded plaintiff recovery on her negligence claims and denied her recovery on her implied warranty claims. Because we conclude that her negligence claims are barred by the "economic loss" rule, we reverse that part of the court's judgment. Because we conclude that she cannot assert an implied warranty claim for economic loss against Can-Am, we affirm that part of the court's judgment.

I.

Zella and Thurlo Hininger operated a custom grain and seed harvesting business. In January 1989, the Hiningers purchased four combines from Parmer County Implement Company ("Parmer") in Friona,

Texas. In September 1989, while working in Idaho, the Hiningers had trouble maintaining air pressure in the drive wheel tires. As a result, the combines were rendered inoperable, causing the Hiningers to experience downtime and suffer losses which the jury found to total $70,340.

The manufacturer of the combines, Case Corporation ("Case"), replaced two of the drive wheels in the fall of 1989 and replaced the other six in April 1990. The replacement wheels, however, began to crack around the bolt holes in September 1990. As a result, the Hiningers again experienced downtime and suffered losses, which the jury found to total $46,500. The original and replacement wheels were manufactured by Can-Am Industries ("Can-Am") in Illinois and were delivered to Case in Illinois. The Hiningers had no contact with Can-Am in connection with the purchase of the combines.

On May 6, 1991, Mrs. Hininger filed suit in her individual capacity and as representative of her husband's estate, seeking recovery on theories of negligence, strict liability, breach of warranty, and violation of the Texas Deceptive Trade Practices Act ("DTPA"). Mrs. Hininger sought damages for lost profits, lost contracts, and repair costs from Parmer, Case, Can-Am, and Case Credit Corporation resulting from the failure of the combine wheels.

In August 1992, Mrs. Hininger settled with all of the defendants except Can-Am. The district court then ruled that Texas law applied to her tort claims, as well as to her contract claims.

Following a trial in January 1993, the jury found for Mrs. Hininger on her breach of warranty and negligent manufacturing claims. However, in response to Can-Am's motion for judgment n.o.v., the district court limited Mrs. Hininger's recovery to her negligence claims.

## II.

### A.

Can-Am argues first that the district court erred in applying Texas law to Mrs. Hininger's tort claims. Can-Am asserts that Idaho and Illinois have the most significant contacts with this case, and that their laws would not allow Mrs. Hininger to recover her lost profits and repair costs in tort. Because Mrs. Hininger does not contest this interpretation of Idaho and Illinois law and because we conclude below that Texas law also disallows the recovery of such damages in tort, we need not decide whether the district court erred in applying Texas law. *See* Eugene F. Scoles & Peter Hay, *Conflict of Laws* 17 (1984) (" "false conflict' exists when the potentially applicable laws do not differ").

### B.

Can-Am argues that the district court erred in allowing Mrs. Hininger to recover her lost profits and repair costs resulting from Can-Am's negligence in manufacturing the combine wheels. For the reasons that follow, we agree with Can-Am's argument and therefore reverse this part of the court's judgment.

In *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977), the Texas Supreme Court held that a purchaser of a

defective mobile home could not recover the difference between the unit's reasonable market value and its purchase price from the manufacturer based on a strict liability theory. In so holding, the court adopted the "economic loss" rule, which requires plaintiffs to recover their economic losses resulting from a defective product in contract rather than in tort.[1] The court explained that the Uniform Commercial Code was "drafted specifically to govern commercial losses and obviously provides the proper remedies to recover such losses." *Id.* at 80; *see generally* Marshall S. Shapo, *The Law of Products Liability* ¶ 27.01 et seq. (1987); J. Hadley Edgar, Jr. & James B. Sales, Texas Torts and Remedies § 40.04[3] (1994).

In *Arkwright-Boston Manufacturers Mutual Insurance Co. v. Westinghouse Electric Corp.,* 844 F.2d 1174, 1177-78 (5th Cir.1988), we held that, under Texas law, a plaintiff cannot recover economic losses resulting from a defective product based on a negligence

---

[1]As the court explained, economic losses can be either direct or consequential:

> Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be "out of pocket"—the difference in value between what is given and received—or "loss of bargain"—the difference between the value of what is received and its value as represented. Direct economic loss also may be measured by costs of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.

*Nobility Homes,* 557 S.W.2d at 78 n. 1 (quoting Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum.L.Rev. 917, 918 (1966)).

theory. In that case, a blade in an electrical turbine broke, causing extensive damage to the turbine. For purposes of our decision, we assumed the manufacturer's negligence, but denied plaintiff recovery because it was only seeking to recover its economic loss. See *id.* We concluded that the magistrate judge had properly granted defendant's summary judgment motion on the ground that: "Texas law does not permit recovery under a negligence theory for economic loss resulting from damages to a defective product." *Id.*[2]

In deciding *Arkwright-Boston,* we relied on the Texas Supreme Court's decision in *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex.1986). In that case, plaintiffs sought recovery for a defective home. They complained of defendant's negligent supervision of the construction of the home. In concluding that plaintiffs could not recover punitive damages, the court held that:

> The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.

*Id.* at 618; *see also Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991) ("When the only loss or damage is to the subject of the contract, the plaintiff's action is ordinarily on the contract."); *see generally* William Powers, Jr. & Margaret Niver, *Negligence, Breach of Contract, and the "Economic Loss"*

---

[2]The United States Supreme Court, in *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), surveyed the law in this area and adopted a similar rule for admiralty cases: a purchaser cannot recover its economic losses resulting from a defective product from a manufacturer in tort.

5

*Rule,* 23 Tex.Tech L.Rev. 477 (1992).

However, because Can-Am did not manufacture the combines, but rather supplied the wheels to Case to incorporate into the combines, the question remains:  Can Mrs. Hininger recover her economic losses from Can-Am in tort?

Initially, it is clear to us that most of the reasoning that led the Texas Supreme Court to reject an action in tort against a manufacturer of a finished product for economic loss supports the denial of a similar action against a component supplier.  Thus, we believe that a rejection of Mrs. Hininger's tort action against Can-Am is consistent with the Texas Supreme Court's reasoning in *Nobility Homes.*

In *King v. Hilton-Davis,* 855 F.2d 1047 (3d Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 839, 102 L.Ed.2d 971 (1989), the Third Circuit addressed the same question and concluded that, under Pennsylvania law, a plaintiff cannot recover her economic losses resulting from a defective product from a component supplier in tort.  In that case, plaintiffs alleged that their potato crop had failed because the seed potatoes they purchased that spring had been treated with a defective sprout suppressant.  *Id.* at 1048. The grower from whom plaintiffs purchased the potatoes had used a sprout suppressant manufactured by defendant.  *Id.* at 1049.

In analyzing plaintiffs' suit against the manufacturer of the sprout suppressant, the court noted that defendant was "a component supplier who is remote from the plaintiff in the production and distribution chain."  *Id.* at 1053.  The court gave a number of

reasons for rejecting plaintiffs' tort claims against the component supplier. First, if plaintiffs had a warranty claim against the component supplier, they should be required to pursue that claim in order to preserve "private risk allocation" so that "manufacturers of products or components thereof will not be exposed to open-ended and indefinite liability." *Id.* at 1054. Second, even if plaintiffs did not have a valid warranty claim against the component supplier, they would still have "a warranty claim against the immediate seller that ... will give the purchaser the benefit of its bargain." *Id.* Finally, the court concluded that, even if plaintiffs could not assert a valid warranty claim against their immediate seller, they still should not be allowed to recover against the component part supplier in tort because:

> Implicit in the [economic loss rule] is the policy judgment that in a commercial context the possibility of an inadequate recovery ... does not justify permitting a tort recovery that will allow a purchaser to reach back up the production and distribution chain, thereby disrupting the risk allocations that have been worked out in the transactions comprising that chain.

*Id.; see also Nathaniel Shipping, Inc. v. General Elec. Co.,* 920 F.2d 1256, 1265 (5th Cir.1991) (economic loss rule applies in admiralty despite lack of privity); *Shipco 2295, Inc. v. Avondale Shipyards, Inc.,* 825 F.2d 925 (5th Cir.1987); *Casa Clara Condominium Ass'n v. Charley Toppino & Sons, Inc.,* 620 So.2d 1244 (Fla.1993).

We find the Third Circuit's reasoning to be persuasive and are convinced that the Texas Supreme Court would adopt this position. We therefore conclude that the district court erred in allowing

7

Mrs. Hininger to recover her lost profits and repair costs from Can-Am based on a negligence theory.

C.

On cross-appeal, Mrs. Hininger contends that the district court erred in dismissing her implied warranty of merchantability claim. The district court held that:

> In this case, it is clear that the bargained-for expectation of Plaintiff was a complete and functional Case combine. Plaintiff points to no evidence that the Hiningers expected anyone other than Case and/or Parmer to resolve their problems with the defective wheels. Both Case and Parmer took affirmative action in an attempt to resolve the wheel problems; Can-Am was not consulted and did not participate in the repair attempts. Plaintiff cites no Texas cases extending liability to a component part supplier in the circumstances of this case. For this reason, the Court concludes that there is no contractual liability to Plaintiff for Can-Am.

Because we agree that Mrs. Hininger cannot assert an implied warranty claim for economic loss against Can-Am, we affirm the district court's dismissal of this claim.

Under Texas law, a warranty of merchantability is implied in every contract for the sale of goods by a merchant, unless the warranty is properly excluded or modified. V.T.C.A. Bus. & C. § 2.314(a). The warranty of merchantability may be disclaimed or modified by the merchant, provided that: (1) the disclaimer is in writing; (2) it is conspicuous; and (3) it expressly mentions the term "merchantability." V.T.C.A. Bus. & C. § 2.316(b).

A number of states make privity a requirement for asserting an implied warranty claim for economic loss. *See* Barkley Clark & Christopher Smith, *The Law of Product Warranties* ¶ 10.03[3] (1984 & 1993 Supp.); Robert E. Cartwright & Jerry J. Phillips, *Products*

8

*Liability* § 2.26 (1986). However, in *Nobility Homes,* the Texas Supreme Court held that: "a manufacturer can be responsible, without regard to privity, for the economic loss which results from his breach of the Uniform Commercial Code's implied warranty of merchantability." 557 S.W.2d at 81. Thus, the Texas Supreme Court dispensed with the privity requirement and permitted a purchaser to assert an implied warranty claim for economic loss against a remote manufacturer of a finished product.

Today's case, however, presents a related, but different question: Can a purchaser go upstream from the manufacturer of the finished product and assert an implied warranty claim for economic loss against a manufacturer of a component part? Although we find no Texas authorities directly addressing this question, we believe that the experienced Texas district judge in this case properly distinguished between the manufacturer of the finished product and the component part manufacturer. She reasoned that the Hiningers bargained for a "complete and functional Case combine," not wheels and axles and all the myriad components that make up the combine. Thus, the district court concluded that the Hiningers had no expectation that Can-Am or any of the other manufacturers of unbranded components would resolve any problem they might experience with the combines.[3] *See also* William K. Jones, *Product Defects Causing Commercial Loss: The Ascendancy of Contract over*

---

[3]Mrs. Hininger does not contend that she and her husband had any contact with Can-Am, that Can-Am's name was on the wheels, or that Can-Am advertised its product to the public at-large. *See Spring Motors Distrib., Inc. v. Ford Motor Co.,* 98 N.J. 555, 489 A.2d 660, 676-77 (1985).

*Tort,* 44 U.Miami L.Rev. 731, 789-93 (1990).

In a general maritime law case dealing with a related problem, we reached a similar conclusion: "The buyer ordinarily has no interest in how or where the manufacturer obtains individual components. The buyer is usually interested in the quality of the finished product and is content to let the manufacturer decide whether to do all the work or delegate part of it to others." *Shipco 2295,* 825 F.2d at 929.

Moreover, we believe that the reasoning of *Nobility Homes* supports the district court's conclusion that Mrs. Hininger cannot assert an implied warranty claim against Can-Am. In explaining its holding, the *Nobility Homes* court recognized that a number of states still require a purchaser to show privity with the defendant to assert an implied warranty claim for economic loss, but that:

> Courts which have declined to overturn the privity requirement in warranty actions for economic loss ... fear that holding manufacturers liable for economic loss imposes unlimited and unforeseeable liability upon manufacturers. These fears are justified when manufacturers are held strictly liable for economic loss under the terms of section 402A of the Restatement (Second) of Torts. But, these fears are not justified when manufacturers are held liable by the Uniform Commercial Code because the Code, itself, protects manufacturers against unlimited and unforeseeable liability. First, the Uniform Commercial Code allows manufacturers to restrict their liability by the exclusion or modification of both implied and express warranties.... Second, manufacturers' liability is restricted by the very terms of the Uniform Commercial Code sections which furnish the consumer's implied warranty remedies....

557 S.W.2d at 82.

Thus, the court in *Nobility Homes* reasoned that a purchaser cannot maintain a strict liability action for economic loss, in part, because of the unlimited and unforeseeable liability it would

10

impose on manufacturers. However, the court concluded that a manufacturer's ability to limit its warranty exposure permitted it to protect itself against unlimited and unforeseeable liability and distinguished the warranty action from the strict liability action. We read this as an important justification for the *Nobility Homes* court's decision to dispense with the privity requirement and allow a purchaser to assert an implied warranty claim for economic loss against a remote manufacturer.

*Clark v. DeLaval Separator Corp.,* 639 F.2d 1320 (5th Cir. Unit A 1981), illustrates our point. In that case, we applied *Nobility Homes* and held a remote manufacturer liable for the ultimate purchaser's economic loss based on the manufacturer's breach of the implied warranty of merchantability. We observed that a remote manufacturer can effectively disclaim its warranty liability either by including a disclaimer in the materials that accompany the product or by insisting that the retailer include the manufacturer's disclaimer in the sales contract with the consumer. *Id.* at 1324.

However, as Judge Logan observed in *Patty Precision Products Co. v. Brown & Sharpe Manufacturing Co.,* 846 F.2d 1247 (10th Cir.1988), it may be difficult or even impossible for a component supplier to disclaim its warranty liability:

> The difficulty of notifying ultimate purchasers is exacerbated if the manufacturer has produced a component rather than a finished product. Components are often hidden within the product, making it difficult or impossible for the manufacturer to notify ultimate purchasers by posting disclaimers on the product itself. Further, while the manufacturer before us, G.E., may be economically powerful enough to require someone like Brown & Sharpe to notify all

purchasers of the warranty limitation, the typical component part manufacturer will be selling to a larger entity which it cannot reasonably be expected to control.

*Id.* at 1257 (Logan, J., concurring in part and dissenting in part).

In sum, we believe that the Texas Supreme Court would distinguish between the manufacturer of the finished product and the component supplier because of the component supplier's inability to disclaim its warranty liability effectively. This distinction, together with the Hiningers' lack of any expectation that Can-Am, the upstream component supplier, would respond to defects in the finished product, lead us to agree with the district court that Mrs. Hininger has no implied warranty action against Can-Am.[4]

### III.

For the reasons stated above, we affirm the district court's dismissal of Mrs. Hininger's implied warranty claims, but reverse the district court's judgment awarding Mrs. Hininger recovery on her negligence claims and render a take-nothing judgment in favor of Can-Am.

AFFIRMED in part; REVERSED and RENDERED in part.

---

[4]In light of this finding, we need not address the viability of Mrs. Hininger's DTPA claim. *See La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 565 (Tex.1984) (DTPA "does not create any warranties; therefore any warranty must be established independently of the act.").

12